IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

Greenbelt Division

```
-------------------------------x
                               :
AUSTIN HYUN SUNG               :
and                            :
SHADI HASSAN:                  :
                               :
        Plaintiffs,            :
                               :
    v.                         :  Case No. 8:11-
                               :     cv-03094-RWT
PEROUTKA & PEROUTKA, P.A.,     :
et al.                         :
                               :
        Defendants.            :
                               :
-------------------------------x
```

Thursday, June 7, 2012

Baltimore, Maryland

Deposition of


SHAWN KENNEDY


witness, called for examination by counsel for the plaintiff, pursuant to notice, at Thomas & Libowitz, P.A., 100 Light St., Suite 1100, Baltimore, Maryland 21202, beginning at 1:39 p.m., before Kathleen Lynn Petley, a notary public for the State of Maryland, when were present on behalf of the respective parties:

Page 2

For the Plaintiffs:

    JEREMY HUANG, ESQUIRE
    ROWE BARNETT, PLLC
    5906 Hubbard Drive
    Rockville, Maryland  20852
    (301) 770-4710

For the Defendant:

    FRANCIS R. LAWS, ESQUIRE
    THOMAS & LIBOWITZ, P.A.
    100 Light Street, Suite 1100
    Baltimore, Maryland  21202
    (410) 752-2468

ALSO PRESENT:

    CRAIG KENNEDY

                    * * * * *

              C O N T E N T S

                    EXAMINATION BY COUNSEL FOR

WITNESS:              DEFENDANT:    PLAINTIFF:

Shawn Kennedy              --             4

                    * * * * *

Page 3

                    EXHIBITS

EXHIBIT NUMBER              MARKED FOR IDENTIFICATION


    1      Entity Detail                    6

    2      Corp. Charter Approval Sheet     8

    7      Answers to Interrogatories      50

Page 4

1            P R O C E E D I N G S
2  WHEREUPON,
3            SHAWN KENNEDY,
4  having been called for examination by counsel for plaintiff,
5  and having been duly sworn by the notary, was examined and
6  testified as follows:
7        EXAMINATION BY COUNSEL FOR PLAINTIFF:
8        BY MR. HUANG:
9     Q   Excuse me for a minute.  I've got a housekeeping
10  thing, and it's an uncomfortable subject for me.
11    A   Absolutely.
12    Q   But, are you admitted in Maryland?
13    A   Yes.
14    Q   Okay.
15    A   To the District Court and to the Federal Court,
16  yes.
17    Q   How about the Maryland Court of Appeals?
18    A   No, none.
19    Q   My understanding is the book of rules says that if
20  you're not admitted in Maryland, then you can't maintain an
21  office in Maryland.
22    A   The principal office is in D.C.
23    Q   Then I just have to, I guess, for the record, to
24  the extent that you're not properly admitted to the Maryland
25  Bar, I'd like to raise that objection but I guess I'm not

Page 5

1  going to stop the deposition.
2     A   Absolutely.
3     Q   Okay.
4     A   Okay?
5     Q   And could you please state your employer?
6     A   Peroutka & Peroutka.
7     Q   And what is your position there?
8     A   I'm the firm manager.
9     Q   Manager?  Okay.  And how long have you worked
10  there?
11    A   Twenty-three years.
12    Q   Twenty-three years?  So, let's see.  From 1990, I
13  guess?  1989?
14    A   '89.
15    Q   Okay.  All right.  All right.  And who's your
16  attorney?
17    A   Frank Laws.
18    Q   Okay.  And have you discussed this case with him
19  prior to the deposition today?
20    A   Yeah, we've discussed the case.
21    Q   Okay.  Have you reviewed any documents before
22  coming today?
23    A   I've reviewed --
24        MR. LAWS: Have you reviewed any documents that I
25  didn't ask you to review?

Page 6

1      THE WITNESS: No.
2      MR. LAWS: Okay.  So the answer to his question
3  was yes or no.  Did you read any documents?
4      THE WITNESS: Okay.  Thank you.
5      BY MR. HUANG:
6      Q  I wasn't trying to trick you there.  Okay.  All
7  right.  Today we're having the deposition on two cases, well
8  one case has been consolidated for Mr. Hassan and Mr. Sung,
9  who were both the clients of ours who were sent collection
10  letters allegedly from Peroutka & Peroutka.  Excuse me going
11  over this.  If you want to answer, please answer truthfully
12  and fully.  If you have any corrections you want to make
13  later after we receive the deposition transcript, please
14  notify the court reporter as soon as possible.  So you work
15  for Peroutka & Peroutka.  Is that a separate entity from
16  Pasadena Receivables, or are they same entity?
17      A  Peroutka & Peroutka is a law firm --
18      Q  Okay.
19      A  So, it's not Pasadena Receivables.
20      Q  Okay.  What is the relationship between Pasadena
21  and Peroutka & Peroutka?
22      A  Pasadena Receivables is a client of Peroutka &
23  Peroutka.
24              (Exhibit No. 1 was
25              marked into evidence.)

Page 7

1      BY MR. HUANG:
2      Q  Okay.  Exhibit 1.  Could you please identify this
3  document?
4      A  Well, it's your document.  What --
5      Q  Okay.
6      A  -- exactly is it?
7      Q  It's a page from the Maryland's SDAT showing the
8  current principal office and resident agent for Peroutka &
9  Peroutka.
10      A  When was this printed?
11      Q  Today.
12      A  And this is for Peroutka & Peroutka?
13      Q  Exactly.
14      A  Well, this is inaccurate, because the principal
15  office is not 8038 Ritchie Highway.
16      Q  Okay.  Thanks.  So the other information is
17  correct, Mr. Stephen Peroutka is the current resident agent
18  as well as the principal of Peroutka & Peroutka?
19      A  I believe, I assume that Steve is the current
20  resident agent.  The address is correct.
21      Q  Okay.
22      A  Um.
23      MR. LAWS: It's just a simple question.  Just I
24  want to ask you not to make any assumptions --
25      THE WITNESS: Okay.

Page 8

1      MR. LAWS: -- unless Mr. Huang asks you to make an
2  assumption, but otherwise --
3      THE WITNESS: Okay.
4      MR. LAWS: He's asking you for what you know.
5      THE WITNESS: Okay.
6      MR. LAWS: Okay.
7              (Exhibit No. 2 was marked
8              into evidence.
9      BY MR. HUANG:
10      Q  Exhibit 2. I just handed you what is the -- I
11  guess it was a corporate amendment for Pasadena Receivables.
12  Could you take a look at the second page?  And could you
13  identify the previous resident agent?  It should be on the
14  second, I guess the third blank.
15      A  The third blank?
16      Q  I'm sorry.  You see the name and address of the
17  resident agent was changed?
18      MR. LAWS: Mr. Kennedy is here as the corporate
19  designee for Peroutka & Peroutka.
20      MR. LAWS: Absolutely.
21      MR. LAWS: And Pasadena Receivables is a client of
22  Peroutka & Peroutka.  So that can be very careful about what
23  he answers, obviously, because it's going to be attorney-
24  client privileged communications.
25      BY MR. HUANG:

Page 9

1      Q  Absolutely.  I'm just trying to delve into whether
2  they're separate entities or not.  From these documents, it
3  appears that they had the same principal and up until
4  recently it looked like they had the same resident agent,
5  the same address.  It's sort of our, just housekeeping.  If
6  they were in the same office, I guess they would sort of
7  be -- were you sort of in-house counsel, or special sort of
8  just the, like a separate arm of Pasadena, or just
9  completely separate entities completely?
10      A  Are you asking me as counsel?  Your question was,
11  as counsel.  I'm not a lawyer.
12      Q  No, just from your knowledge of the corporate, I
13  guess, identities.  They're in the same office, correct?
14  They were in the same office at one point, correct?
15  Pasadena and Peroutka & Peroutka?
16      MR. LAWS: I'm not, I think what you're question
17  is, what you're asking is whether or not we have two
18  separate, distinct corporate entities.
19      MR. HUANG: Mm-hmm.
20      MR. LAWS: Whether the law firm is a separate
21  corporate entity from Pasadena Receivables, Inc.?
22      THE WITNESS: They are two separate entities.
23      BY MR. HUANG:
24      Q  Okay.  Was Pasadena Receivables what you could say
25  they comprise the majority of your workload, or do you have

1    other clients besides Pasadena Receivables?
2          MR. LAWS: I'm going to object at this point
3    because, you know, whether or to what extent a client is or
4    is not a majority client, is a minority client, or whatever,
5    of the law firm, I'm not sure how that relates in any way to
6    the allegations of the complaint or the counter-claim.
7          MR. HUANG: Absolutely.  There's later documents.
8    I'm just trying to find out what they know between Pasadena
9    and Peroutka & Peroutka, whether they have, like I said, if
10   they're interrelated, or if they share certain officers and
11   certain employees, that kind of thing.
12         MR. LAWS: Okay, so the whether and to what extent
13   Pasadena Receivables, Inc., is a percentage of business that
14   is of Peroutka & Peroutka, and that's not related to the
15   corporate relationships of the two.  I mean it's, for
16   instance, whether Mr. Sung is a repeat client of Rowe
17   Barnett is irrelevant to whether or not he was the subject
18   of an FDCPA violation, and analogously the same here.
19         MR. HUANG: Well actually, well there's a certain
20   document later that I'll get to.  I just wanted to see if
21   you -- all I was asking is if they're distinct entities,
22   that's all I was asking.  Yes or no.
23         THE WITNESS: There are distinct entities, yes.
24         BY MR. HUANG:
25   Q    But you shared offices with their employees at one

1    point?  That's the other question.
2          MR. LAWS: I'm not sure what you mean by share
3    offices.
4          BY MR. HUANG:
5    Q    On the page I showed you, it said the principal
6    office for Peroutka & Peroutka and Pasadena Receivables was
7    both 8028 Ritchie Highway, Suite 300, at one point, at least
8    prior to November of last year, which was, I believe, maybe
9    right around the same time this complaint was filed.
10   A    You said that they've got the same address, but I
11   don't know what you mean by share offices.
12   Q    If they're in the same office as employees of
13   Peroutka & Peroutka, then they work in the same, within the
14   same confines as Pasadena Receivables.  That's just, you
15   know, for the witness to answer.  If he doesn't know, he
16   doesn't know.
17   A    He's asking?
18         MR. LAWS: You can answer him.  What I can tell
19   you is we lease to a subtenant here who is a client of the
20   firm's.
21         MR. HUANG: Okay.
22         MR. LAWS: In one sense, you could say they share
23   offices because they come in and out of the same --
24         MR. HUANG: Well, I mean, if he knows, then, you
25   know, he can answer himself.

1          THE WITNESS: Well, I do know.  Is that your
2    question?
3          BY MR. HUANG:
4    Q    Yes.
5    A    Okay.  There is an office inside of Peroutka &
6    Peroutka that's sublet by Pasadena Receivables.
7    Q    Okay.  All right.  So you say you're the manager
8    at Peroutka & Peroutka?  Could you describe your educational
9    background?  I'm sorry for asking, where did you go to
10   college?
11   A    I went to Anne Arundel Community College.
12   Q    Okay.  And what did you study there?
13   A    General Studies.
14   Q    General Studies?  Okay.  And did you get a
15   Bachelor's, or an Associate's?
16   A    Associate's Degree.
17   Q    Okay.  And then as soon as you finished that, you
18   went to Peroutka & Peroutka, or did you have any intervening
19   employment before that?
20   A    I worked at the firm while I was going to
21   college.
22   Q    Oh, that's interesting.  Okay.  And, so you're
23   familiar with their practices over 23 years I'm sure you
24   know the ins and outs.
25   A    Okay.

1    Q    And what would you say are your current duties as
2    a manager?
3    A    My current duties include the operations of the
4    firm, running the firm, management of various departments,
5    personnel-related issues, hiring of new employees,
6    collectors --
7    Q    Mm-hmm.
8    A    -- legal assistants and so forth.
9    Q    Legal assistants?  Could you, you know, clarify
10   what you mean by that?
11   A    Paralegals, people who work in the legal
12   department.
13   Q    All right.  And, do you handle the training of
14   employees, or do you just do the hiring and firing of the
15   employees?
16   A    I handle some training, yes.
17   Q    Okay.  And what areas of training would those be?
18   A    Introduction to the firm's practices.
19   Q    Okay.
20   A    Training on FDCPA issues.
21   Q    Okay.
22   A    Introduction to those things that are passed on to
23   other people within the firm.
24   Q    Okay.  And so you've taken certain FDCPA seminars?
25   Do you attend those kinds of things or do you get them off

Page 14

1  the Internet?
2    A  We attend various conferences throughout the year.
3  We are provided with various materials from experts in and
4  around the country that update us on FDCPA compliance, and
5  by we, training --
6    Q  And by we, do you mean the firm, or you personally
7  plus the principals?
8    A  Myself, the principals, employees of the firm.
9    Q  Okay.
10   A  Multiple people within the firm.  Everyone is
11 trained.
12   Q  Okay.
13   A  Continually trained.
14   Q  Okay.  So you're familiar with the statute and
15 what it says, correct?  With the FDCPA?
16   A  Generally, yes.
17   Q  Generally, okay.  All right.  I've handed you the
18 answer of, I guess this is the joint answer of Peroutka &
19 Peroutka and Pasadena Receivables regarding Mr. Hassan's
20 complaint.  Do you recognize this document?
21   A  Yes.
22   Q  Okay.  And were you the one who helped Mr. Wallace
23 draft this answer, or was it another employee?
24   A  Well, I conferred with my attorney.
25   Q  Okay.  All right.

Page 15

1          MR. LAWS:  For the record, the answer was not
2  drafted by the client.
3          BY MR. HUANG:
4    Q  But in terms of the information put together that
5  you provided in terms of admitted/denied.
6          MR. LAWS:  I understand we're not going to get
7  into attorney-client communications.
8          MR. HUANG:  Absolutely.
9          MR. LAWS:  It's not the client's fact.
10         MR. HUANG:  Okay.
11         BY MR. HUANG:
12   Q  All right.  Could you turn to page 4.  Okay?
13   A  Okay.
14   Q  So you've seen this document before, and looked at
15 the defenses.  I guess, under the statute, is there a
16 contention that the plaintiff or the debtor has a duty to
17 notify the creditor of a bankruptcy in order for them to
18 comply with the statute?
19         MR. LAWS:  I'm going to object to the extent that
20 that calls for a legal conclusion.
21         MR. HUANG:  It's referring to his knowledge, since
22 he's been trained in the FDCPA, he should, just to the
23 extent of his training.
24         MR. LAWS:  All right.  Just want to make sure that
25 he's not testifying as a lawyer --

Page 16

1          MR. HUANG:  Absolutely.
2          MR. LAWS:  -- with respect to legal conclusions.
3  That's fine.
4          BY MR. HUANG:
5    Q  Is it your understanding that if, assuming the
6  debtor does not notify a creditor or a debt collector of
7  bankruptcy, that there is no obligation to scrub the
8  account?
9    A  To scrub the account?
10   Q  Or to check for bankruptcy prior to collection.
11         MR. LAWS:  Objection as to form.
12         MR. HUANG:  Okay.
13         BY MR. HUANG:
14   Q  Rephrase.  Under the statute, does debtor have any
15 duty, under the FDCPA?
16         MR. LAWS:  Duty as to what?
17         MR. HUANG:  As to any kind of duty.
18         MR. LAWS:  Objection to the extent that it calls
19 for legal conclusions.  You may answer to the best of your
20 knowledge.
21         THE WITNESS:  I want to make sure I understand
22 your question.
23         MR. HUANG:  Okay.
24         THE WITNESS:  Does the debtor have any duties
25 under the FDCPA --

Page 17

1          MR. HUANG:  Yes.
2          THE WITNESS:  -- to inform someone of a
3  bankruptcy?
4          BY MR. HUANG:
5    Q  Yes.
6    A  I'm not aware that the FDCPA addresses bankruptcy.
7    Q  Okay.  The FDCPA prevents the collector from
8  making any false statements.  Is that your understanding?
9    A  False or misleading statements, yes.
10   Q  Okay.  So is it your understanding that a debtor
11 has the duty to prevent the collector from making any false
12 statements?
13   A  I don't think it's a consumer's responsibility to
14 prevent a collector from a misleading statement.  I don't.
15   Q  Thank you.  All right.  So, when you originally
16 came to the firm back in 1989, how were you trained in the
17 FDCPA?  Or was it pretty much the same thing as right now,
18 you went to seminars, or anything more specific?
19   A  I can't think back to 1989.
20   Q  Fair enough.  But when you were originally
21 trained, do you remember the process, how it works, or was
22 it just sort of a beginning?
23   A  Well, the process has changed over the 23 years.
24   Q  Okay.
25   A  The various different training materials that

Page 18

1 exist now that didn't exist then provide for different
2 training methods, and we've reviewed the FDCPA and various
3 other training opportunities every year.
4    Q  Okay.  And who provides the training?  Is it a
5 third party, or it someone within the firm?
6    A  It's mostly both.
7    Q  Okay.  Are you affiliated with the American
8 Collectors Association?
9    A  We are a member of the ACA, yes.
10    Q  Okay.  And are you familiar with the MAP attorney
11 review program at all?
12    A  No.
13    Q  Okay.  So the collection letters you send out,
14 these are drafted by the firm, they weren't sent out for
15 outside review?
16    A  The firm -- the letters are drafted by our office,
17 and they are reviewed by a lawyer.
18    Q  By a lawyer?  Okay.  Mr. Peroutka, or one of the
19 other attorneys?
20    A  They're reviewed by outside counsel.
21    Q  Outside counsel, okay.  How many attorneys work at
22 Peroutka & Peroutka currently?  Just a general estimate.
23    A  There are three.
24    Q  Three?
25    A  Mm-hmm.

Page 19

1    Q  How many other non-lawyer attorneys are there in
2 the firm currently?
3    A  Approximately 41.
4    Q  Forty-one?  And they all work at the Ritchie
5 Highway, or do they work at a separate office?
6    A  We have one location.
7    Q  One location, okay.  So you oversee the training
8 of the employees.  How often do you hold sort of refresher
9 classes on the FDCPA with them?
10    A  Minimum yearly.
11    Q  Yearly?  Okay.  Do they go to any seminars, or is
12 it sort of an in-house kind of thing going on?
13    A  They?
14    Q  Yes.
15    A  Can you be more specific?
16    Q  Sorry.  The employees that you, I guess, when you
17 hold these training courses within your company, do you take
18 them to sort of seminars, or is it something you hold within
19 the office?
20    A  Some of the staff go to conferences.  Most of the
21 staff are in-house, the training is in-house from various
22 methods of training.
23    Q  Okay.  Let's see here.  With regard to Mr. Sung,
24 this was an account from Capital One.  Do you recall this
25 was sent to you by Pasadena Receivables, or was it directly

Page 20

1 from Credit One?
2    A  Can you state that again?
3    Q  I'm sorry.  Okay.  There are two cases, Shadi
4 Hassan and Austin Sung.  Austin Sung, the account was
5 originally a Capital One Account?
6    A  Okay.
7    Q  Was that referred to you by Pasadena Receivables,
8 or was it from Capital One?
9    A  Capital One is a client of Peroutka & Peroutka.
10    Q  Okay.
11    A  Capital One placed the Hyun Sung account with our
12 firm.
13    Q  Okay.  And then for Mr. Hassan, there was a Credit
14 One account from Pasadena Receivables.  Do you have any
15 knowledge as to whether Pasadena Receivables bought it from
16 Credit One directly, or was there an intervening creditor?
17 If you don't know --
18    A  Yeah.  I don't believe Pasadena Receivables
19 purchased it directly from Credit One.
20    Q  You don't.  Do you have any knowledge as to the
21 identity of whom they purchased it from?
22    A  Not without looking at the assignments.
23    Q  Okay.  So this is the Notice of Deposition that
24 our office sent to Mr. Law's office a little while ago.
25 Have you seen this before?

Page 21

1    A  Yes.
2    Q  Okay.  Would you please turn to page 3.
3    A  Can you describe which one --
4    Q  Absolutely.  Page 3 is the one that has duces
5 tecum, sort of a little bit above halfway.
6    A  I see it, yes.
7    Q  Okay.  So you reviewed this and for documents that
8 we had asked for and to bring to this deposition?
9        MR. LAWS: First of all, the deposition if I
10 recall correctly is somewhere near the end of May, so that
11 the document request does not require a response until
12 the -- is May 25th, so at least 30 days after the --
13        MR. HUANG: Okay.
14        MR. LAWS: -- the notice.
15        MR. HUANG: Okay.
16        MR. LAWS: There's also a problem by the fact that
17 it violates the scheduling order in the magistrate's most
18 recent order to you, so.
19        BY MR. HUANG:
20    Q  A certain file that you received from Pasadena
21 Receivables for Mr. Hassan's accounts, it would show all the
22 assignments from the prior creditors to Pasadena
23 Receivables?
24    A  Yes.
25    Q  Could you tell me a little bit more about what

1  happens when an account is assigned to you by clients,
2  either Pasadena Receivables or Capital One?
3      MR. LAWS: What Peroutka does in terms of its
4  macro policies procedures, mechanisms, etc., we've objected
5  to that in our Answers to Interrogatories that we've given,
6  that we submitted.  I don't have any problem with you if you
7  want to say with respect to the account --
8      MR. HUANG: Okay.
9      MR. LAWS: -- Mr. Sung had, or Mr. Hassan --
10     MR. HUANG: Absolutely.
11     MR. LAWS: -- that would put it that way.
12     BY MR. HUANG:
13   Q   For Mr. Hassan's and Mr. Sung's accounts, when
14  those were received from the respective clients, what was
15  the process?  What happened to them once they were received
16  by Peroutka & Peroutka?
17   A   Do you want to deal with them one by one, or --
18   Q   Sure.  Absolutely.  Let's start with Mr. Hassan's
19  account.
20   A   Okay.
21   Q   From Pasadena.
22   A   Okay.  You want to know what happened when it was
23  placed?
24   Q   Yes.
25   A   The account was placed with our firm on June 11,

1  2009.  The accounts are scrubbed for various issues, to make
2  sure that there's no bankruptcy, decedents, or military
3  activity.  And the demand letter is scheduled for printing
4  to go to the individual's address, which occurred the
5  following day.
6    Q   So your firm scrubs accounts for bankruptcy prior
7  to attempts for collection?
8      MR. LAWS: Okay.  For the Sung account?
9      MR. HUANG: For this account, yes.  For Mr.
10  Hassan's account, in particular.
11     THE WITNESS: The account was scrubbed at the time
12  of placement.
13     BY MR. HUANG:
14   Q   Okay.  And would you elaborate how that process
15  works?
16   A   Yeah.  The data regarding Mr. Hassan is scrubbed
17  against known bankruptcy data bases.
18   Q   Would you describe what kind of data bases your
19  firm uses?
20   A   PACER.
21   Q   PACER?
22   A   And there's a name match or not match, depending
23  on what's happening at the time of the scrub.
24   Q   I just handed you your firm's Answers to our
25  Interrogatories.  Would you please turn to page 15?

1   A   Yes.
2   Q   Okay.  Is that your signature?
3   A   Yes.
4   Q   Okay.  Can you turn to page 8?
5   A   Okay.
6   Q   Okay.  You were the one who helped draft Mr. Law's
7  responses to the Interrogatories?
8   A   Yeah.  I provided the -- I helped to provide the
9  answers, yes.
10   Q   Okay.  So, turning to page 8, it says that please
11  identify sort of a chronology as to the handling of this
12  debt.  And you answered that Pasadena put this account for
13  collections with your office on June 11 --
14   A   Which question are you --
15   Q   Number 1.
16   A   Okay.
17   Q   And you answered that the account was placed for
18  collection on June 11, 2009, correct?
19   A   Yes.
20   Q   Okay.  And in Interrogatory No. 13, you provided
21  the -- it starts at the bottom of page 8 and sort of runs
22  through the first half of page 9 --
23   A   Mm-hmm.
24   Q   You provided the context to the client, to our
25  client, Mr. Hassan?

1   A   Yes, sir.
2   Q   Okay.  I've given you Pasadena Receivables'
3  Answers to Interrogatories for Mr. Hassan's case.  Would you
4  please turn to page 6.
5   A   Okay.
6   Q   In Interrogatory No. 11, we asked Pasadena the
7  same questions as to the sort of handling of this debt.
8  They are indicating that they sent the account to you in
9  2011.
10     MR. LAWS: I have the wrong set, Jeremy.  What I
11  have are Shadi Hassan's first set of Interrogatories.
12     MR. HUANG: Yes.  It should be Shadi Hassan.
13  Unless I sent you the wrong things.
14     MR. LAWS: No. 5 of Shadi Hassan's?
15     MR. HUANG: Shadi Hassan's, Pasadena Receivables'
16  Answers to Shadi Hassan's Interrogatories?  Correct or no?
17     MR. LAWS: No. 5 says Answers to Shady Hassan's
18  Interrogatories.  No. 6 is PRI's.  I'm sorry, it's PRI's.
19     MR. HUANG: Yes.  That's what I was referring to,
20  yes.  The first one I gave you was Peroutka & Peroutka's.
21  I'm referring to Exhibit No. 6, PRI's Answers to
22  Interrogatories, Answer No. 11.
23     MR. LAWS: Okay.  That's obviously -- it's a
24  different client.
25     MR. HUANG: Absolutely.  I understand.

Page 26

1    MR. LAWS: They're not here, and they're not
2  signed by him either, so.
3    MR. HUANG: No, sir. I'm just asking him to
4  verify.
5    BY MR. HUANG:
6    Q  Interrogatory No. 11, they are answering in terms
7  of chronology as to when this account was sent to your
8  office. They claim they sent it on June 10, 2011. Is this
9  accurate, or this is an accurate recollection on their part,
10  or do you believe this is an error?
11    MR. LAWS: The Answer to Interrogatory No. 11, it
12  says in front of that, PRI does not engage in any collection
13  activities.
14    MR. HUANG: Sorry?
15    MR. LAWS: On June 10, Defendant, PRI, closed on
16  the transaction by which it acquired bankrupt status.
17    MR. HUANG: Okay. On June 12th, that information
18  was transferred --
19    MR. LAWS: Transferred electronically to P & P.
20    BY MR. HUANG:
21    Q  Okay. So that's in 2011. Was this account sent
22  back to PRI, or was this always sent to your office since
23  2009?
24    A  You're asking me to answer the interrogatories
25  for --

Page 27

1    Q  No. I'm asking if -- you indicated in your -- for
2  Peroutka & Peroutka's answer, that this account was placed
3  with you in June 11, 2009.
4    A  Yes. Correct. That's correct.
5    Q  Okay. Was this account always with your firm, or
6  was it pulled back by Pasadena, PRI, sort of in the interim?
7    A  The account was placed with us June 11, 2009. And
8  there was no interruption. The account was never withdrawn.
9  No.
10    Q  Okay. Did anything happen to the account in 2011,
11  around this June 11th, June 12th?
12    A  No.
13    Q  Okay. Okay. Let's go back to the original. So
14  you scrub the accounts by checking against PACER to see if
15  accounts have been placed into bankruptcy, correct?
16    A  Correct.
17    Q  Okay. All right. And do you do any subsequent
18  checks, or is it a one-time deal only?
19    A  We scrub the accounts at the beginning of the
20  placement.
21    Q  Okay.
22    A  We send notice --
23    Q  Mm-hmm.
24    A  -- to consumers --
25    Q  Okay.

Page 28

1    A  -- at their address, put them on notice about
2  their account.
3    Q  Okay.
4    A  Which is what we did on the Hassan case and the
5  Sung case.
6    Q  Okay. But there are no further checks against
7  PACER after the first time?
8    MR. LAWS: In those two cases?
9    THE WITNESS: There's no further check on Hassan.
10  There's no further check on Sung.
11    BY MR. HUANG:
12    Q  Okay, thank you. Okay.
13    A  Thank you.
14    Q  I just handed you Peroutka & Peroutka's Answers to
15  the Interrogatories regarding Mr. Sung's case. Could you
16  please turn to page 13?
17    A  Okay.
18    Q  Is that your signature?
19    A  That's my signature, yes.
20    Q  Will you please turn to page 7.
21    A  Okay.
22    Q  All right. Could you please read the first
23  sentence of Interrogatory No. 11?
24    A  Identify and describe each communication or
25  attempted communication between the defendants and the

Page 29

1  plaintiff or any other person which was made in connection
2  with collection of plaintiff's debt by stating the
3  following.
4    Q  Okay. And --
5    A  Do you want me to read the whole sentence?
6    Q  No, that's fine. And on page 8, could you please
7  read your answer to Interrogatory No. 11.
8    A  Defendant is unaware of any communication between
9  the defendants with the plaintiff or any other person which
10  was made in connection with the collection of plaintiff's
11  debt.
12    Q  I've just handed you a letter from your office to
13  Mr. Sung. Do you recall this letter, or do you personally
14  recall this letter being sent out?
15    A  Do I recall the letter going out?
16    Q  Yes. Yes.
17    A  I can see that the letter was mailed on September
18  22nd --
19    Q  Okay.
20    A  2011.
21    Q  Okay. So, would you consider this letter a
22  communication to the plaintiff?
23    A  Yes.
24    Q  In connection with the collection of a debt?
25    A  Yes.

Page 30

1    Q   Okay.
2        MR. LAWS: Jeremy, just for clarity.
3        MR. HUANG: Yes.
4        MR. LAWS: It's not, however, a communication
5    between the defendants with the plaintiff.  Between the
6    defendants means a communication between PRI and Peroutka
7    with letters.
8        MR. HUANG: Well.
9        MR. LAWS: It's what the sentence says.
10       MR. HUANG: Okay.  With plaintiff, okay.
11       BY MR. HUANG:
12   Q   All semantics aside, were there any other, further
13   communications, prior communications between your office and
14   Mr. Sung?
15   A   The communications between Sung?
16   Q   Yes.
17   A   There was a demand letter mailed on March 15,
18   2011.
19   Q   Okay.  Was there anything else sent to him?
20   A   Chronology, yeah.  There was a letter mailed to
21   him on April 14, 2011.  There was the letter that you just
22   showed me, the September 22nd letter that was mailed to him.
23   Q   So March 14th was the first demand letter, you
24   said?
25   A   March 15th.

Page 31

1    Q   March 15th, okay.
2    A   Did you get the other two dates?
3    Q   April 14th, I'm sorry.
4    A   April 14, 2011, and 9/22/11.
5    Q   Okay.  Did your office make any calls to Mr.
6    Sung's -- were there any telephone conversations between Mr.
7    Sung and your office?
8        MR. LAWS: Which question?  Did we call, or did we
9    talk to him?
10       MR. HUANG: Either way.
11       BY MR. HUANG:
12   Q   Did you have any telephone conversations, either
13   initiated by him or by your office?
14   A   We had no discussions with him, no.
15   Q   Okay.  Was his account ever pulled from your
16   office by Capital One?
17   A   Pulled?
18   Q   Yes.  Was it ever withdrawn?
19   A   No.
20   Q   How long has Capital One been a client of yours?
21       MR. LAWS: Can you give me some relevance for
22   that?
23       MR. HUANG: Absolutely.  Based on Mr. Sung's
24   testimony, there were calls from Capital One to his
25   residence regarding this debt.  I'm trying to find out if he

Page 32

1    knows if that's their client's policy to collect while
2    they're collecting.
3        MR. LAWS: The only way he would know that is
4    through an attorney-client communication.
5        BY MR. HUANG:
6    Q   Was it your understanding that your office
7    maintains the sole responsibility of collecting this debt?
8        MR. LAWS: That's also going to be an attorney-
9    client communication, and effectively what you're asking him
10   is what the client charges him, the direction to do.  He's
11   given you the scope of the representation, that is to
12   collect a debt.  But beyond that, it seems to me that we're
13   getting into conversations between his office and his client
14   with respect to the representation.
15       BY MR. HUANG:
16   Q   But there were no calls from your offices,
17   basically?  There were no telephone conversations between
18   your office and Mr. Sung?
19   A   I want you to be clear in your question, if you
20   could.  Were there calls, or was there a discussion?  What's
21   the question?
22   Q   Were there any calls, first, between your office
23   and Mr. Sung?
24   A   I'm sorry.  Calls between us would indicate that
25   there was a contact.

Page 33

1    Q   Yes.
2    A   Okay.
3    Q   Were there any discussions outside of these
4    letters?  Were there any conversations, spoken
5    conversations?
6    A   We never spoke with Mr. Sung, okay?
7    Q   All right.  Let's go ahead.  Do you recall any
8    calls between your office and Mr. Hassan?
9    A   Phone calls made to him?
10   Q   Yes.
11   A   There were one, two, three, four, five calls
12   attempted to a phone number and there was never a contact.
13   Q   Could you provide that phone number?
14   A   Sure.  301-916-8882.
15   Q   And where did you get this number from?  Was it
16   provided by the client, or?
17   A   I believe the number was provided in the
18   placement.
19   Q   I just handed you the letter from your office to
20   Mr. Hassan dated October 18th.  Could you identify the
21   address for Mr. Hassan, for the record?
22   A   12537 Crossridge Way, Germantown, Maryland 20874.
23   Q   Okay.  And was this address provided by your
24   client, or was that something you pulled?
25   A   That was the address that was provided in the

1  original placement of the account.
2     Q   Was Mr. Hassan's account ever pulled from your
3  office by Pasadena?  Withdrawn from collection?
4     A   (No audible response.)
5     Q   No?  Could you provide the dates when these
6  attempted calls occurred to Mr. Hassan?
7     A   Yeah.  June 17, 2009.
8     Q   2009, okay.
9     A   June 23, 2009.
10    Q   Okay.
11    A   June 24, 2009.
12    Q   Okay.
13    A   June 25, 2009.
14    Q   Okay.
15    A   July 1st --
16    Q   Okay.
17    A   -- 2009.
18    Q   Is it your testimony that there were no further
19  calls made to Mr. Hassan on this account?
20    A   That's correct.
21    Q   Okay.  Does your office ever get in contact with a
22  Hind Too Sung (phonetic sp.)?
23    A   Hind?
24    Q   Yes.
25    A   H-I-N-D?  Not that I'm aware of, no.  I don't have

1  any record of that.
2     Q   Okay.  Were there calls made to a third party
3  to --
4     A   No.
5     Q   -- get Mr. Hassan's -- okay.  All right.  What
6  system do you use to keep track of the collection attempts?
7         MR. LAWS: Can I just raise, in terms of either
8  Hassan or Sung?
9         BY MR. HUANG:
10    Q   Mr. Sung.
11    A   What collection system do we use?
12    Q   Yes.  Is it a software system, or is it all
13  handwritten?
14    A   No, we have a software system that's called
15  Collection Partner.
16    Q   And did you use the same software for Mr. Sung, or
17  was it a different kind of software?
18    A   Same software.
19    Q   Does the software log calls, or is this something
20  you enter manually?
21    A   We manually enter each event as it occurs.
22    Q   Okay.  So if the collector doesn't put in
23  information, then you have no record of anything that
24  happens.  Let's say if a collector makes a call and they
25  don't record it, you wouldn't know if a call was made.

1     A   Yeah.
2     Q   Okay.  Could you tell me what happened when you
3  found out that these accounts were in bankruptcy?  Well, Mr.
4  Sung's and Mr. Hassan's account in particular?
5     A   When we were informed of the bankruptcies, we
6  closed the files and administered proceedings that in
7  accordance with a stay.
8     Q   So, do you personally handle any collection calls,
9  or are you generally just supervising, supervisor on the
10  floor?
11    A   I handle collection calls.
12    Q   Okay.  So you personally place collection calls as
13  well?
14    A   (No audible response.)
15    Q   Okay.  Do you have any specific training as to
16  what certain guidance is provided to the collectors in terms
17  of these kinds of calls?
18    A   The same guidance that's inherent with the
19  training of the FDCPA.
20    Q   Okay.  And could you be more specific about that?
21    A   Can you be specific --
22    Q   Sure.
23    A   -- in what you want to know?  I'd --
24    Q   In terms of speaking to debtors, what is the
25  procedure for investigating a claim when a debtor disputes

1  the debt?  What is the process for investigating such a
2  claim?
3         MR. LAWS: It's not an issue in this case, right?
4         MR. HUANG: I'm just trying to find out.  They
5  said they have procedures for a bona fide error.  This is
6  sort of relevant to that.
7         MR. LAWS: Okay.  As I said in our Answers to
8  Interrogatories, we object for the reasons stated in the
9  Interrogatories to providing information with respect to
10  what is in essence a proprietary system that the firm has
11  put together for the purposes of its collection business.
12  Now, we are prepared to and would answer any questions with
13  respect to Mr. Sung and Mr. Hassan.  And the question you
14  just posed, I don't see has any connection to any of the
15  allegations made by either Mr. Sung or Mr. Hassan.
16        MR. HUANG: I don't think their accounts are any
17  different from normal accounts, you know, up until they were
18  notified of the bankruptcy.  They weren't treated any
19  differently from a normal collection account, correct?
20        MR. LAWS: But there was no disputes, there's
21  nothing from either of those individuals that they disputed
22  any of the debts.
23        MR. HUANG: Okay.  Well.
24        BY MR. HUANG:
25    Q   All right.  Here's another question.  Has your

Page 38

1 office ever been sued for a violation of the stay or the
2 discharge injunction?
3     MR. LAWS: Again, we're going to object to that
4 because it's not relevant to this case.  We're not going to
5 go into other cases.  It's not in the scope of the
6 litigation.
7     MR. HUANG: It's relevant in terms of whether the
8 statutory damages as to whether there's been previous errors
9 in terms of the FDCPA.
10     MR. LAWS: So if your question is whether or not
11 they have ever been found guilty of a violation of the
12 FDCPA?
13     MR. HUANG: Whether there have been other cases
14 filed against them.
15     BY MR. HUANG:
16   Q  Do you have any knowledge of cases being sued
17 either on the stay or the discharge injunction?
18     MR. LAWS: Okay, then that's accusations.  Have
19 any accusations been made against them?
20     MR. HUANG: Yes.
21     MR. LAWS: That's not going to be relevant.  What
22 would be relevant, whether there were any founded
23 allegations, whether they'd ever been found guilty of
24 violating the FDCPA.  Right?  I mean, just because somebody
25 picks up the phone or --

Page 39

1     MR. HUANG: Absolutely.  But I just want to know.
2     MR. LAWS: It's all right.  I don't have a problem
3 with even a question that asks if they've ever been found
4 guilty of violations of the FDCPA.  If the question is
5 whether they've ever been accused --
6     BY MR. HUANG:
7   Q  Whether there have been any complaints filed.
8 That's just my question and you can answer that.  That's all
9 I need to know.
10     MR. LAWS: That I don't think is relevant.  I
11 don't want to get into other cases, and this is --
12     MR. HUANG: I mean if it's not relevant, you can
13 object but he can still answer.
14     MR. LAWS: Except that it's interposed solely for
15 the purposes of harassment at that point.  The question
16 whether or not they have met the criteria for repeat
17 violations of the FDCPA is warranted.  But that's not your
18 question.
19     MR. HUANG: Okay.
20     BY MR. HUANG:
21   Q  Well, have there ever been any judgments entered
22 against you in regards to either the FDCPA or a bankruptcy
23 violation in terms of the automatic stay on discharge
24 injunction?
25   A  No.

Page 40

1   Q  How long have you been using Collection Partner?
2   A  The collection system Collection Partner?
3   Q  Yes.
4   A  It's been installed in our office since about
5 1995.
6   Q  So when a bankruptcy scrub occurs, it is entered
7 into that system, or is it a separate system for that kind
8 of entry?
9     MR. LAWS: Specifically for Mr. --
10     BY MR. HUANG:
11   Q  Mr. Sung and Mr. Hassan, yes.  Assume that every
12 question that I ask from now on relates only to those two
13 accounts.
14   A  I appreciate that.  I'm not going to assume
15 anything, though.  The -- is every -- I'm sorry, can you ask
16 the question again?
17   Q  Okay.  In terms of when the bankruptcy scrubs were
18 performed, that information is put into Collection Partner,
19 or is there a separate software?
20   A  Just -- there's -- we only have Collection
21 Partner.  That's our system.
22   Q  Okay.  In the accounts sent to you for placement,
23 are Social Security numbers listed?
24     MR. LAWS: For these two accounts?
25     BY MR. HUANG:

Page 41

1   Q  Yes, for these two accounts.
2   A  They are typically provided.  Without looking at
3 these two files right now, I'm not certain that they were
4 but I believe they were.
5   Q  Okay.  Do you have personal knowledge about the
6 PACER procedure?
7   A  I know that we conduct the scrubs through the
8 bankruptcy data bases.  I'm not familiar with how the
9 electronic interchange occurs.
10   Q  Okay.  So the individual collector is the only one
11 who does the PACER search, or is that one of the attorneys
12 who does that?
13   A  No.  It is done at a batch level for, and at time
14 of placement.
15   Q  Okay.
16   A  So it's an IT function.
17   Q  IT function.  As in it's done by the client, or is
18 it sort of intersect?  Could you clarify?
19   A  It's done at placement by our IT department, when
20 the accounts are loaded into the system.
21   Q  Do you have knowledge as to what that procedure
22 is?
23   A  I know that it's an IT function --
24   Q  Okay.
25   A  -- and that it's done with every placement.

1    Q   Okay.  And could you identify the supervisor or
2    the person handling the IT function?
3    A   Yeah.  Kris Ruckelshaus.  You know I'm going to
4    have to spell that one for you.  It's K-R-I-S, R-U-C-K-E-L-
5    S-H-A-U-S.  R is the --
6    Q   Okay.
7    A   -- beginning of the last name.  There you go.
8    It's weird.
9    Q   First name and the last name are the same start, I
10   know.  Okay.  So you have no information as to how they do
11   the search?
12   A   I know what happens.  I don't know the technical
13   ins and outs of how it works.
14   Q   Okay.  So before the collector even gets to it,
15   then it's been scrubbed before.  The collectors themselves
16   don't do any independent verification of bankruptcy.
17   A   No.
18   Q   Have there been times when you've called a
19   bankruptcy debtor?
20       MR. LAWS: Objection.  It doesn't pertain to Sung
21   or Hassan.  So if you're going to go outside the Hanoh
22   (phonetic sp.) files -- so if it's -- I'm not going to go
23   outside.  I'm not going to ask the witness to go outside
24   anything that's relevant to the circumstances related to the
25   two lawsuits at issue --

1        MR. HUANG: Well, like I say, I'm going toward the
2    bona fide error.  If this happens, I mean, case law is if it
3    happens on a very small basis it's not an issue but if it's
4    widespread then they don't have procedures in place to
5    prevent a bona fide error.
6        BY MR. HUANG:
7    Q   So if you could please tell me if there have been
8    times where there have been calls placed to a bankruptcy
9    debtor.
10       MR. LAWS: You can answer.
11       THE WITNESS: I don't have any knowledge of any
12   particular account.  There are processes in place to ensure
13   that we don't violate the stay.
14       BY MR. HUANG:
15   Q   Okay.  And could you go into more detail as to
16   that process?
17   A   The scrub process is integral to how it works.  We
18   make sure at placement that we are not proceeding.  If we
19   receive notice, we take appropriate steps in conjunction
20   with a stay.
21   Q   Okay.  But you supervise the collectors, correct?
22   So do they report to you when a bankruptcy is reported by
23   the court, do the collectors report to you, or do they
24   handle it individually?
25   A   Bankruptcies are not handled by collectors.

1    Q   Okay.  Who handles the bankruptcies?
2    A   Our legal department handles bankruptcy
3    notifications.
4    Q   Okay.  There are three attorneys in your office,
5    correct?  Are they the ones in the legal department, or are
6    those mostly paralegals handling those kinds of issues?
7    A   There are multiple people in our legal department
8    who are supervised by the lawyers.  The bankruptcy
9    notifications that come in through the normal channels,
10   which are either through e-mail or by written notice are
11   immediately reacted to within 24 hours of notice so that we
12   do not violate any stays.
13   Q   Do you have a contact at the legal department?
14   Underneath the attorneys, who is the supervisor of the legal
15   department?  Or is there no middle management?
16   A   The individual responsible for the bankruptcy --
17   Q   Yes.
18   A   -- if you will?  Making sure that -- I do.
19   Q   It's you?
20   A   No, no, no.  It's not me.
21   Q   Okay.
22   A   You asked me if I know who the person is.
23   Q   Yes.
24   A.  Yes.
25   Q   Okay.  Would you please provide that person's

1    name?
2    A   Yes.  Christina Nescio.
3    Q   Could you please spell the last name?
4    A   N-E-S-C-I-O.
5    Q   I-O?
6    A   Correct.
7    Q   Okay.  All right.
8    A   I'm 99 percent sure that's how you spell it.
9    Q   All right.  But you supervise the collectors on
10   the floor, correct?
11   A   Yes.
12   Q   Okay.  So in your recollection, has a collector
13   ever reported to you that a debtor has filed bankruptcy?
14   A   Has a debtor -- has a collector ever told me that
15   a debtor has filed bankruptcy?
16   Q   Or alerted you to an account that has been in
17   bankruptcy but you did not receive notice at that point?
18   A   That's just too vague for me to be able to answer.
19   Q   Okay.  Let me rephrase.  If a collector were
20   informed by a debtor of a bankruptcy personally, what would
21   be the procedure for remedying that?
22   A   The process that a collector goes through if
23   someone says that they are filing bankruptcy is that we
24   notate the file and immediately move the file to the named
25   individual so that the proper checks can occur to make sure

1 that our firm is not violating a stay.
2    Q   Okay.  This is if a debtor says they are filing,
3 or have filed for bankruptcy?
4    A   Both.
5    Q   Okay.  So it's moved to the legal department, who
6 handle the bankruptcies if such an incident happens?
7    A   Correct.
8    Q   Okay.  So they don't report to you, it goes
9 directly to the legal department?  Okay.  As to Mr. Sung's
10 accounts, it was placed in your office around March of 2011?
11 Is that what you recall?
12    A   Yes.
13    Q   Okay.  And it was, a complaint was filed with the
14 District Court around September of the same year?
15    A   I didn't have the complaint date, but I believe
16 that's accurate.
17    Q   Okay.
18    A   Do you have a copy of it that you can show me?
19    Q   No, I don't have it with me --
20    A   Okay.
21    Q   -- the letter, I think it was Exhibit -- the
22 letter to Mr. Hassan, I think, was Exhibit --
23    A   The letter is dated September 22nd.
24    Q   Yes.
25    A   You asked about the complaint.  I don't have it.

1    Q   Yes.  I think it was around the same time as well.
2    A   Okay.
3    Q   Prior to filing suit, there were no subsequent
4 checks for bankruptcy prior to filing?
5    A   The account was placed March 14th.  It was
6 scrubbed for bankruptcy and notice was sent to the consumer
7 on March 15th --
8    Q   Okay.
9    A   -- providing the consumer with the full validation
10 required under the FDCPA, to dispute the debt, to inform us
11 of any problems with the account.  There was a letter mailed
12 to the consumer on April 14, 2011, with a memo notice that
13 we were involved in the case still.
14    Q   Okay.
15    A   Okay?
16    Q   Okay.  But around September, there's nothing
17 further sent out to him --
18    A   A further scrub of the account?
19    Q   Yes.
20    A   No.
21    Q   Okay.  So you mentioned that you train the
22 employees, the collection employees, oversee the training.
23    A   Correct.  I did mention that, yes.
24    Q   Okay.  So for employees, are the employees
25 restricted from calling a third party, or are they only

1 allowed to call the debtor?
2    A   Within the company's policies.
3        MR. LAWS:  I'm going to object to the form, but
4 you probably understand what he's looking for, so.
5        THE WITNESS:  Third parties?  Can you describe
6 third parties?
7        BY MR. HUANG:
8    Q   Absolutely.  Anyone other than the debtor.
9    A   Well, that could be a multitude of people.
10    Q   Okay, so anyone other than their husband or their
11 attorney.
12    A   For what purposes?
13    Q   For any purpose.  Let's just say --
14    A   There wouldn't be any purpose.
15    Q   Let's say for location purposes, are they
16 permitted to?
17    A   Are we talking about Sung, or Hassan?
18    Q   General office policy, I think.
19    A   Are we talking about Sung or Hassan?
20    Q   Hassan because Mr. Sung they wouldn't have
21 called --
22    A   Okay, on Hassan we called a number that we
23 believed to be the defendant or the consumer's number.
24    Q   Okay.
25    A   Five times.

1    Q   Okay.
2    A   There were only those five phone calls to that
3 specific number.
4    Q   Okay.
5    A   On the Sung case, there were two phone calls made
6 to a number that was provided to us in the placement file.
7 On March 22nd and March 23rd.  And those were the only phone
8 calls that were made.  They were made to the consumer's
9 phone number.
10    Q   Okay.  I'm just asking for general.  In your
11 training of the employees, they're trained to follow the
12 FDCPA?  The FDCPA permits location information.  Are they
13 permitted at all to contact third parties?
14    A   They're permitted to do it.  It's allowed under
15 the FDCPA.
16    Q   And what is the phone number you have on file for
17 Mr. Sung?
18    A   410-889-7541.
19    Q   No contacts.
20    A   Right.
21    Q   Calls.
22    A   Correct.  Correct.
23    Q   From the notes, could you tell who the individual
24 collectors who made those calls were?
25    A   I did -- I do not have that information.

Page 50

1    Q  So it's not on the collection notes?
2    A  It is in the collection notes.  I don't have the
3  collection notes in front of me.
4    Q  Could you refer to, I think, the response to
5  Interrogatories for Austin Sung?  I think it's Exhibit 7, I
6  think.
7    A  Okay, 7.  Okay.
8    Q  Could you turn to page 6?
9    A  Okay.
10    Q  All right.  So Interrogatory No. 6 asks for the
11  disciplinary policies in case an individual collector does
12  violate the statute.  It says to the extent, describe policy
13  exist and be provided.  Are there policies in place,
14  disciplinary policies, for violating the statute?
15    A  Yep.  There are.  I'm sorry, yes.
16    Q  Could you describe them?
17    A  The policy for maintaining adherence to the FDCPA
18  is a, basically a three strikes and you're out.
19    Q  Three strikes?  Okay.
20    A  Right.  So there's a review process built into the
21  policy so that if there are issues or concerns that we are
22  alerted to we follow them and administer them, retrain to
23  the issues and follow the procedure.
24    Q  Okay.  So one strike is a violation of the
25  statute, or is it something --

Page 51

1    A  No, not necessarily.
2    Q  Okay.  What does a strike consist of?  Generally,
3  what falls under a strike?
4    A  Well, we haven't had an issue with that policy
5  for, that I can remember.  So.
6    Q  Under the guidelines, I mean.  Under your
7  guidelines, what would be considered a strike, even if it
8  hasn't happened in a while?
9        THE WITNESS: Does that go under these cases?
10        MR. LAWS: No.  You can give a general answer.
11  It's all right.
12        THE WITNESS: It wouldn't even need to be
13  something that's an FDCPA violation.  It could be something
14  that's construed as not comporting themselves professionally
15  that is a concern.  It would be everything within the FDCPA
16  and more, to ensure that the treatment of the consumer is
17  professional and appropriate.
18        MR. HUANG: Okay.
19        BY MR. HUANG: So.  Okay, I think that's all.  I
20  have no more questions.
21        THE WITNESS: Sorry?
22        MR. HUANG: I said no more questions.
23        THE WITNESS: Okay.
24        MR. LAWS: We're done?
25        MR. HUANG: Yes, we're done.

Page 52

1        MR. LAWS: Oh.  We will read and sign.
2        (Whereupon, at 2:54 p.m., the deposition was
3  concluded.)

4

5              * * * * *

6        I have read the foregoing pages 3 through 52,
7  which contain a correct transcription of my answers to the
8  questions recorded therein, except as noted on the errata
9  sheet, if any.
10
11
12
13        _____
14              SHAWN KENNEDY
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE OF NOTARY REPORTER                Page 53

1
2    I, Kathleen Lynn Petley, a Notary Reporter, in and for
3  the State of Maryland, County of Baltimore, do hereby
4  certify that the Witness whose testimony appears in the
5  foregoing transcript was first duly sworn by me;  that the
6  testimony of said witness was taken by me and thereafter
7  reduced to typewriting by me or under my direction;  that
8  said transcript is a true and accurate record of the
9  testimony given to the best of my ability;  that I am
10  neither counsel for, related to nor employed by any of the
11  parties to the action in which this deposition was taken;
12  and further, that I am not a relative or employee of any
13  attorney or counsel employed by the parties hereto, nor
14  financially or otherwise interested in the outcome of this
15  action.
16
17
18
19
20                              Kathleen Lynn Petley
21                              Notary Reporter
22
23  My Commission Expires March 8, 2015
24
25

**1**

**1 (3)**
6:24;7:2;24:15
**10 (2)**
26:8,15
**11 (11)**
22:25;24:13,18;25:6,
22;26:6,11;27:3,7;
28:23;29:7
**11th (1)**
27:11
**12537 (1)**
33:22
**12th (2)**
26:17;27:11
**13 (2)**
24:20;28:16
**14 (3)**
30:21;31:4;47:12
**14th (3)**
30:23;31:3;47:5
**15 (2)**
23:25;30:17
**15th (3)**
30:25;31:1;47:7
**17 (1)**
34:7
**18th (1)**
33:20
**1989 (3)**
5:13;17:16,19
**1990 (1)**
5:12
**1995 (1)**
40:5
**1st (1)**
34:15

**2**

**2 (2)**
8:7,10
**2:54 (1)**
52:2
**2009 (11)**
23:1;24:18;26:23;
27:3,7;34:7,8,9,11,13,17
**2011 (10)**
25:9;26:8,21;27:10;
29:20;30:18,21;31:4;
46:10;47:12
**20874 (1)**
33:22
**22nd (4)**
29:18;30:22;46:23;
49:7
**23 (3)**
12:23;17:23;34:9
**23rd (1)**
49:7
**24 (2)**

34:11;44:11
**25 (1)**
34:13
**25th (1)**
21:12

**3**

**3 (3)**
21:2,4;52:6
**30 (1)**
21:12
**300 (1)**
11:7
**301-916-8882 (1)**
33:14

**4**

**4 (1)**
15:12
**41 (1)**
19:3
**410-889-7541 (1)**
49:18

**5**

**5 (2)**
25:14,17
**52 (1)**
52:6

**6**

**6 (5)**
25:4,18,21;50:8,10

**7**

**7 (3)**
28:20;50:5,7

**8**

**8 (4)**
24:4,10,21;29:6
**8028 (1)**
11:7
**8038 (1)**
7:15
**89 (1)**
5:14

**9**

**9 (1)**
24:22
**9/22/11 (1)**
31:4
**99 (1)**
45:8

**A**

**able (1)**
45:18
**above (1)**
21:5
**Absolutely (14)**
4:11;5:2;8:20;9:1;
10:7;15:8;16:1;21:4;
22:10,18;25:25;31:23;
39:1;48:8
**ACA (1)**
18:9
**accordance (1)**
36:7
**account (37)**
16:8,9;19:24;20:4,5,
11,14;22:1,7,19,25;23:8,
9,10,11;24:12,17;25:8;
26:7,21;27:2,5,7,8,10;
28:2;31:15;34:1,2,19;
36:4;37:19;43:12;45:16;
47:5,11,18
**accounts (16)**
21:21;22:13;23:1,6;
27:14,15,19;36:3;37:16,
17;40:13,22,24;41:1,20;
46:10
**accurate (3)**
26:9,9;46:16
**accusations (2)**
38:18,19
**accused (1)**
39:5
**acquired (1)**
26:16
**activities (1)**
26:13
**activity (1)**
23:3
**actually (1)**
10:19
**address (9)**
7:20;8:16;9:5;11:10;
23:4;28:1;33:21,23,25
**addresses (1)**
17:6
**adherence (1)**
50:17
**administer (1)**
50:22
**administered (1)**
36:6
**admitted (3)**
4:12,20,24
**admitted/denied (1)**
15:5
**affiliated (1)**
18:7
**again (3)**
20:2;38:3;40:16
**against (6)**

23:17;27:14;28:6;
38:14,19;39:22
**agent (6)**
7:8,17,20;8:13,17;9:4
**ago (1)**
20:24
**ahead (1)**
33:7
**alerted (2)**
45:16;50:22
**allegations (3)**
10:6;37:15;38:23
**allegedly (1)**
6:10
**allowed (2)**
48:1;49:14
**always (2)**
26:22;27:5
**amendment (1)**
8:11
**American (1)**
18:7
**analogously (1)**
10:18
**Anne (1)**
12:11
**answered (2)**
24:12,17
**Appeals (1)**
4:17
**appears (1)**
9:3
**appreciate (1)**
40:14
**appropriate (2)**
43:19;51:17
**Approximately (1)**
19:3
**April (4)**
30:21;31:3,4;47:12
**areas (1)**
13:17
**arm (1)**
9:8
**around (7)**
11:9;14:4;27:11;
46:10,14;47:1,16
**Arundel (1)**
12:11
**aside (1)**
30:12
**assigned (1)**
22:1
**assignments (2)**
20:22;21:22
**assistants (2)**
13:8,9
**Associate's (2)**
12:15,16
**Association (1)**
18:8
**assume (3)**
7:19;40:11,14

**assuming (1)**
16:5
**assumption (1)**
8:2
**assumptions (1)**
7:24
**attempted (3)**
28:25;33:12;34:6
**attempts (2)**
23:7;35:6
**attend (2)**
13:25;14:2
**attorney (4)**
5:16;14:24;18:10;
48:11
**attorney- (2)**
8:23;32:8
**attorney-client (2)**
15:7;32:4
**attorneys (6)**
18:19;21;19:1;41:11;
44:4,14
**audible (1)**
34:4;36:14
**Austin (3)**
20:4,4;50:5
**automatic (1)**
39:23
**aware (2)**
17:6;34:25

**B**

**Bachelor's (1)**
12:15
**back (5)**
17:16,19;26:22;27:6,
13
**background (1)**
12:9
**bankrupt (1)**
26:16
**bankruptcies (4)**
36:5;43:25;44:1;46:6
**bankruptcy (30)**
15:17;16:7,10;17:3,6;
23:2,6,17;27:15;36:3;
37:18;39:22;40:6,17;
41:8;42:16,19;43:8,22;
44:2,8,16;45:13,15,17,
20,23;46:3;47:4,6
**Bar (1)**
4:25
**Barnett (1)**
10:17
**Based (1)**
31:23
**bases (3)**
23:17,18;41:8
**basically (2)**
32:17;50:18
**basis (1)**
43:3

**batch (1)**
41:13
**beginning (3)**
17:22;27:19;42:7
**besides (1)**
10:1
**best (1)**
16:19
**beyond (1)**
32:12
**bit (2)**
21:5,25
**blank (2)**
8:14,15
**bona (3)**
37:5;43:2,5
**book (1)**
4:19
**both (4)**
6:9;11:7;18:6;46:4
**bottom (1)**
24:21
**bought (1)**
20:15
**bring (1)**
21:8
**built (1)**
50:20
**business (2)**
10:13;37:11

**C**

**call (4)**
31:8;35:24,25;48:1
**called (5)**
4:4;35:14;42:18;
48:21,22
**calling (1)**
47:25
**calls (25)**
15:20;16:18;31:5,24;
32:16,20,22,24;33:8,9,
11;34:6,19;35:2,19;36:8,
11,12,17;43:8;49:2,5,8,
21,24
**came (1)**
17:16
**can (22)**
8:22;11:18,18,25;
19:15;20:2;21:3;24:4;
29:17;31:21;35:7;36:21;
39:8,12,13;40:15;43:10;
45:25;46:18;48:5;51:5,
10
**Capital (9)**
19:24;20:5,8,9,11;
22:2;31:16,20,24
**careful (1)**
8:22
**case (13)**
5:18,20;6:8;25:3;28:4,
5,15;37:3;38:4;43:2;

47:13;49:5;50:11
**cases (8)**
6:7;20:3;28:8;38:5,13,
16;39:11;51:9
**certain (7)**
10:10,11,19;13:24;
21:20;36:16;41:3
**changed (2)**
8:17;17:23
**channels (1)**
44:9
**charges (1)**
32:10
**check (3)**
16:10;28:9,10
**checking (1)**
27:14
**checks (4)**
27:18;28:6;45:25;47:4
**Christina (1)**
45:2
**chronology (3)**
24:11;26:7;30:20
**circumstances (1)**
42:24
**claim (3)**
26:8;36:25;37:2
**clarify (2)**
13:9;41:18
**clarity (1)**
30:2
**classes (1)**
19:9
**clear (1)**
32:19
**client (20)**
6:22;8:21,24;10:3,4,4,
16;11:19;15:2;20:9;
24:24,25;25:24;31:20;
32:9,10,13;33:16,24;
41:17
**clients (4)**
6:9;10:1;22:1,14
**client's (2)**
15:9;32:1
**closed (2)**
26:15;36:6
**collect (2)**
32:1,12
**collecting (2)**
32:2,7
**collection (27)**
6:9;16:10;18:13;23:7;
24:18;26:12;29:2,10,24;
34:3;35:6,11,15;36:8,11,
12;37:11,19;40:1,2,2,18,
20;47:22;50:1,2,3
**collections (1)**
24:13
**collector (13)**
16:6;17:7,11,14;
35:22,24;41:10;42:14;
45:12,14,19,22;50:11

**collectors (9)**
13:6;18:8;36:16;
42:15;43:21,23,25;45:9;
49:24
**college (3)**
12:10,11,21
**coming (1)**
5:22
**communication (8)**
28:24,25;29:8,22;
30:4,6;32:4,9
**communications (5)**
8:24;15:7;30:13,13,15
**Community (1)**
12:11
**company (1)**
19:17
**company's (1)**
48:2
**complaint (6)**
10:6;11:9;14:20;
46:13,15,25
**complaints (1)**
39:7
**completely (2)**
9:9,9
**compliance (1)**
14:4
**comply (1)**
15:18
**comporting (1)**
51:14
**comprise (1)**
9:25
**concern (1)**
51:15
**concerns (1)**
50:21
**concluded (1)**
52:3
**conclusion (1)**
15:20
**conclusions (2)**
16:2,19
**conduct (1)**
41:7
**conferences (2)**
14:2;19:20
**conferred (1)**
14:24
**confines (1)**
11:14
**conjunction (1)**
43:19
**connection (4)**
29:1,10,24;37:14
**consider (1)**
29:21
**considered (1)**
51:7
**consist (1)**
51:2
**consolidated (1)**

6:8
**construed (1)**
51:14
**consumer (4)**
47:6,9,12;51:16
**consumers (1)**
27:24
**consumer's (3)**
17:13;48:23;49:8
**contact (5)**
32:25;33:12;34:21;
44:13;49:13
**contacts (1)**
49:19
**contain (1)**
52:7
**contention (1)**
15:16
**context (1)**
24:24
**Continually (1)**
14:13
**conversations (6)**
31:6,12;32:13,17;
33:4,5
**copy (1)**
46:18
**corporate (6)**
8:11,18;9:12,18,21;
10:15
**corrections (1)**
6:12
**correctly (1)**
21:10
**counsel (7)**
4:4,7;9:7,10,11;18:20,
21
**counter-claim (1)**
10:6
**country (1)**
14:4
**courses (1)**
19:17
**Court (6)**
4:15,15,17;6:14;
43:23;46:14
**Credit (4)**
20:1,13,16,19
**creditor (3)**
15:17;16:6;20:16
**creditors (1)**
21:22
**criteria (1)**
39:16
**Crossridge (1)**
33:22
**current (5)**
7:8,17,19;13:1,3
**currently (2)**
18:22;19:2

**D**

**damages (1)**
38:8
**data (4)**
23:16,17,18;41:8
**date (1)**
46:15
**dated (2)**
33:20;46:23
**dates (1)**
31:2;34:5
**day (1)**
23:5
**days (1)**
21:12
**DC (1)**
4:22
**deal (2)**
22:17;27:18
**debt (11)**
16:6;24:12;25:7;29:2,
11,24;31:25;32:7,12;
37:1;47:10
**debtor (15)**
15:16;16:6,14,24;
17:10;36:25;42:19;43:9;
45:13,14,15,20;46:2;
48:1,8
**debtors (1)**
36:24
**debts (1)**
37:22
**decedents (1)**
23:2
**Defendant (3)**
26:15;29:8;48:23
**defendants (1)**
28:25;29:9;30:5,6
**defenses (1)**
15:15
**Degree (1)**
12:16
**delve (1)**
9:1
**demand (3)**
23:3;30:17,23
**department (9)**
13:12;41:19;44:2,5,7,
13,15;46:5,9
**departments (1)**
13:4
**depending (1)**
23:22
**deposition (8)**
5:1,19;6:7,13;20:23;
21:8,9;52:2
**describe (7)**
12:8;21:3;23:18;
28:24;48:5;50:12,16
**designee (1)**
8:19
**detail (1)**
43:15
**different (5)**

17:25;18:1;25:24;
35:17;37:17
**differently (1)**
37:19
**direction (1)**
32:10
**directly (4)**
19:25;20:16,19;46:9
**discharge (3)**
38:2,17;39:23
**disciplinary (2)**
50:11,14
**discussed (2)**
5:18,20
**discussion (1)**
32:20
**discussions (2)**
31:14;33:3
**dispute (1)**
47:10
**disputed (1)**
37:21
**disputes (2)**
36:25;37:20
**distinct (3)**
9:18;10:21,23
**District (2)**
4:15;46:14
**document (6)**
7:3,4;10:20;14:20;
15:14;21:11
**documents (6)**
5:21,24;6:3;9:2;10:7;
21:7
**done (6)**
41:13,17,19,25;51:24,
25
**draft (2)**
14:23;24:6
**drafted (3)**
15:2;18:14,16
**duces (1)**
21:4
**duly (1)**
4:5
**duties (3)**
13:1,3;16:24
**duty (5)**
15:16;16:15,16,17;
17:11

**E**

**educational (1)**
12:8
**effectively (1)**
32:9
**either (10)**
22:2;26:2;31:10,12;
35:7;37:15,21;38:17;
39:22;44:10
**elaborate (1)**
23:14

**electronic (1)**
41:9
**electronically (1)**
26:19
**else (1)**
30:19
**e-mail (1)**
44:10
**employee (1)**
14:23
**employees (14)**
10:11,25;11:12;13:5,
14,15;14:8;19:8,16;
47:22,22,24,24;49:11
**employer (1)**
5:5
**employment (1)**
12:19
**end (1)**
21:10
**engage (1)**
26:12
**enough (1)**
17:20
**ensure (2)**
43:12;51:16
**enter (2)**
35:20,21
**entered (2)**
39:21;40:6
**entities (6)**
9:2,9,18,22;10:21,23
**entity (3)**
6:15,16;9:21
**entry (1)**
40:8
**errata (1)**
52:8
**error (4)**
26:10;37:5;43:2,5
**errors (1)**
38:8
**essence (1)**
37:10
**estimate (1)**
18:22
**etc (1)**
22:4
**even (4)**
39:3;42:14;51:7,12
**event (1)**
35:21
**Everyone (1)**
14:10
**evidence (2)**
6:25;8:8
**exactly (2)**
7:6,13
**examination (2)**
4:4,7
**examined (1)**
4:5
**Except (2)**

39:14;52:8
**Excuse (2)**
4:9;6:10
**Exhibit (8)**
6:24;7:2;8:7,10;25:21;
46:21,22;50:5
**exist (3)**
18:1,1;50:13
**experts (1)**
14:3
**extent (7)**
4:24;10:3,12;15:19,
23;16:18;50:12

**F**

**fact (2)**
15:9;21:16
**Fair (1)**
17:20
**falls (1)**
51:3
**false (3)**
17:8,9,11
**familiar (4)**
12:23;14:14;18:10;
41:8
**FDCPA (27)**
10:18;13:20,24;14:4,
15;15:22;16:15,25;17:6,
7,17;18:2;19:9;36:19;
38:9,12,24;39:4,17,22;
47:10;49:12,12,15;
50:17;51:13,15
**Federal (1)**
4:15
**fide (3)**
37:5;43:2,5
**file (5)**
21:20;45:24,24;49:6,
16
**filed (7)**
11:9;38:14;39:7;
45:13,15;46:3,13
**files (3)**
36:6;41:3;42:22
**filing (4)**
45:23;46:2;47:3,4
**find (3)**
10:8;31:25;37:4
**fine (2)**
16:3;29:6
**finished (1)**
12:17
**firing (1)**
13:14
**firm (23)**
5:8;6:17;9:20;10:5;
12:20;13:4,4,23;14:6,8,
10;17:16;18:5,14,16;
19:2;20:12;22:25;23:6,
19;27:5;37:10;46:1
**firm's (3)**

11:20;13:18;23:24
**First (9)**
21:9;24:22;25:11,20;
28:7,22;30:23;32:22;
42:9
**five (3)**
33:11;48:25;49:2
**floor (2)**
36:10;45:10
**follow (3)**
49:11;50:22,23
**following (2)**
23:5;29:3
**follows (1)**
4:6
**foregoing (1)**
52:6
**form (2)**
16:11;48:3
**forth (1)**
13:8
**Forty-one (1)**
19:4
**found (4)**
36:3;38:11,23;39:3
**founded (1)**
38:22
**four (1)**
33:11
**Frank (1)**
5:17
**front (2)**
26:12;50:3
**full (1)**
47:9
**fully (1)**
6:12
**function (4)**
41:16,17,23;42:2
**further (7)**
28:6,9,10;30:12;
34:18;47:17,18

**G**

**gave (1)**
25:20
**General (6)**
12:13,14;18:22;48:18;
49:10;51:10
**Generally (4)**
14:16,17;36:9;51:2
**Germantown (1)**
33:22
**gets (1)**
42:14
**given (3)**
22:5;25:2;32:11
**goes (2)**
45:22;46:8
**guess (10)**
4:23,25;5:13;8:11,14;
9:6,13;14:18;15:15;

19:16
**guidance (2)**
36:16,18
**guidelines (2)**
51:6,7
**guilty (3)**
38:11,23;39:4

**H**

**half (1)**
24:22
**halfway (1)**
21:5
**handed (6)**
8:10;14:17;23:24;
28:14;29:12;33:19
**handle (6)**
13:13,16;36:8,11;
43:24;46:6
**handled (1)**
43:25
**handles (2)**
44:1,2
**handling (4)**
24:11;25:7;42:2;44:6
**handwritten (1)**
35:13
**Hanoh (1)**
42:21
**happen (1)**
27:10
**happened (4)**
22:15,22;36:2;51:8
**happening (1)**
23:23
**happens (6)**
22:1;35:24;42:12;
43:2,3;46:6
**harassment (1)**
39:15
**Hassan (24)**
6:8;20:4,13;22:9;
23:16;24:25;25:12;28:4,
9;33:8,20,21;34:6,19;
35:8;37:13,15;40:11;
42:21;46:22;48:17,19,
20,22
**Hassan's (14)**
14:19;21:21;22:13,18;
23:10;25:3,11,14,15,16,
17;34:2;35:5;36:4
**helped (3)**
14:22;24:6,8
**Here's (1)**
37:25
**Highway (3)**
7:15;11:7;19:5
**himself (1)**
11:25
**Hind (2)**
34:22,23
**H-I-N-D (1)**

34:25
**hiring (2)**
13:5,14
**hold (3)**
19:8,17,18
**hours (1)**
44:11
**housekeeping (2)**
4:9;9:5
**HUANG (80)**
4:8;6:5;7:1;8:1,9,20,
25;9:19,23;10:7,19,24;
11:4,21,24;12:3;15:3,8,
10,11,21;16:1,4,12,13,
17,23;17:1,4;21:13,15,
19;22:8,10,12;23:9,13;
25:12,15,19,25;26:3,5,
14,17,20;28:11;30:3,8,
10,11;31:10,11,23;32:5,
15;35:9;37:4,16,23,24;
38:7,13,15,20;39:1,6,12,
19,20;40:10,25;43:1,6,
14;48:7;51:18,19,22,25
**husband (1)**
48:10
**Hyun (1)**
20:11

**I**

**identify (6)**
7:2;8:13;24:11;28:24;
33:20;42:1
**identities (1)**
9:13
**identity (1)**
20:21
**immediately (2)**
44:11;45:24
**inaccurate (1)**
7:14
**Inc (2)**
9:21;10:13
**incident (1)**
46:6
**include (1)**
13:3
**independent (1)**
42:16
**indicate (1)**
32:24
**indicated (1)**
27:1
**indicating (1)**
25:8
**individual (5)**
41:10;44:16;45:25;
49:23;50:11
**individually (1)**
43:24
**individuals (1)**
37:21
**individual's (1)**

23:4
**inform (2)**
17:2;47:10
**information (9)**
7:16;15:4;26:17;
35:23;37:9;40:18;42:10;
49:12,25
**informed (2)**
36:5;45:20
**inherent (1)**
36:18
**in-house (4)**
9:7;19:12,21,21
**initiated (1)**
31:13
**injunction (1)**
38:2;17;39:24
**ins (2)**
12:24;42:13
**inside (1)**
12:5
**installed (1)**
40:4
**instance (1)**
10:16
**integral (1)**
43:17
**interchange (1)**
41:9
**interesting (1)**
12:22
**interim (1)**
27:6
**Internet (1)**
14:1
**interposed (1)**
39:14
**interrelated (1)**
10:10
**Interrogatories (13)**
22:5;23:25;24:7;25:3,
11,16,18,22;26:24;
28:15;37:8,9;50:5
**Interrogatory (7)**
24:20;25:6;26:6,11;
28:23;29:7;50:10
**interruption (1)**
27:8
**intersect (1)**
41:18
**intervening (2)**
12:18;20:16
**into (13)**
6:25;8:8;9:1;15:7;
27:15;32:13;38:5;39:11;
40:7,18;41:20;43:15;
50:20
**Introduction (2)**
13:18,22
**investigating (2)**
36:25;37:1
**involved (1)**
47:13

**I-O (1)**
45:5
**irrelevant (1)**
10:17
**issue (4)**
37:3;42:25;43:3;51:4
**issues (6)**
13:5,20;23:1;44:6;
50:21,23
**it's (1)**
42:22

**J**

**Jeremy (2)**
25:10;30:2
**joint (1)**
14:18
**judgments (1)**
39:21
**July (1)**
34:15
**June (14)**
22:25;24:13,18;26:8,
15,17;27:3,7,11,11;34:7,
9,11,13

**K**

**keep (1)**
35:6
**KENNEDY (3)**
4:3;8:18;52:14
**kind (6)**
10:11;16:17;19:12;
23:18;35:17;40:7
**kinds (3)**
13:25;36:17;44:6
**knowledge (9)**
9:12;15:21;16:20;
20:15,20;38:16;41:5,21;
43:11
**known (1)**
23:17
**knows (2)**
11:24;32:1
**Kris (1)**
42:3
**K-R-I-S (1)**
42:4

**L**

**last (4)**
11:8;42:7,9;45:3
**later (2)**
6:13;10:7,20
**law (4)**
6:17;9:20;10:5;43:2
**Laws (67)**
5:17,24;6:2;7:23;8:1,
4,6,18,21;9:16,20;10:2,
12;11:2,18,22;15:1,6,9,

19,24;16:2,11,16,18;
21:9,14,16;22:3,9,11;
23:8;25:10,14,17,23;
26:1,11,15,19;28:8;30:2,
4,9;31:8,21;32:3,8;35:7;
37:3,7,20;38:3,10,18,21;
39:2,10,14;40:9,24;
42:20;43:10;48:3;51:10,
24;52:1
**Law's (2)**
20:24;24:6
**lawsuits (1)**
42:25
**lawyer (4)**
9:11;15:25;18:17,18
**lawyers (1)**
44:8
**lease (1)**
11:19
**least (2)**
11:7;21:12
**legal (13)**
13:8,9,11;15:20;16:2,
19;44:2,5,7,13,14;46:5,9
**letter (17)**
23:3;29:12,13,14,15,
17,21;30:17,20,21,22,
23;33:19;46:21,22,23;
47:11
**letters (5)**
6:10;18:13,16;30:7;
33:4
**level (1)**
41:13
**listed (1)**
40:23
**litigation (1)**
38:6
**little (3)**
20:24;21:5,25
**loaded (1)**
41:20
**location (4)**
19:6,7;48:15;49:12
**log (1)**
35:19
**long (3)**
5:9;31:20;40:1
**look (1)**
8:12
**looked (2)**
9:4;15:14
**looking (3)**
20:22;41:2;48:4

**M**

**macro (1)**
22:4
**magistrate's (1)**
21:17
**mailed (5)**
29:17;30:17,20,22;

47:11
**maintain (1)**
4:20
**maintaining (1)**
50:17
**maintains (1)**
32:7
**majority (1)**
9:25;10:4
**makes (1)**
35:24
**making (3)**
17:8,11;44:18
**management (2)**
13:4;44:15
**manager (4)**
5:8;9;12:7;13:2
**manually (2)**
35:20,21
**many (2)**
18:21;19:1
**MAP (1)**
18:10
**March (9)**
30:17,23,25;31:1;
46:10;47:5,7;49:7,7
**marked (2)**
6:25;8:7
**Maryland (6)**
4:12,17,20,21,24;
33:22
**Maryland's (1)**
7:7
**match (2)**
23:22,22
**materials (2)**
14:3;17:25
**may (3)**
16:19;21:10,12
**maybe (1)**
11:8
**mean (10)**
10:15;11:2,11,24;
13:10;14:6;38:24;39:12;
43:2;51:6
**means (1)**
30:6
**mechanisms (1)**
22:4
**member (1)**
18:9
**memo (1)**
47:12
**mention (1)**
47:23
**mentioned (1)**
47:21
**met (1)**
39:16
**methods (2)**
18:2;19:22
**middle (1)**
44:15

**military (1)**
23:2
**Minimum (1)**
19:10
**minority (1)**
10:4
**minute (1)**
4:9
**misleading (2)**
17:9,14
**Mm-hmm (5)**
9:19;13:7;18:25;
24:23;27:23
**more (8)**
17:18;19:15;21:25;
36:20;43:15;51:16,20,22
**Most (2)**
19:20;21:17
**mostly (2)**
18:6;44:6
**move (1)**
45:24
**moved (1)**
46:5
**much (1)**
17:17
**Multiple (2)**
14:10;44:7
**multitude (1)**
48:9
**Myself (1)**
14:8

## N

**name (7)**
8:16;23:22;42:7,9,9;
45:1,3
**named (1)**
45:24
**near (1)**
21:10
**necessarily (1)**
51:1
**need (2)**
39:9;51:12
**Nescio (1)**
45:2
**N-E-S-C-I-O (1)**
45:4
**new (1)**
13:5
**none (1)**
4:18
**non-lawyer (1)**
19:1
**normal (3)**
37:17,19;44:9
**notary (1)**
4:5
**notate (1)**
45:24
**noted (1)**

52:8
**notes (4)**
49:23;50:1,2,3
**Notice (10)**
20:23;21:14;27:22;
28:1;43:19;44:10,11;
45:17;47:6,12
**notifications (2)**
44:3,9
**notified (1)**
37:18
**notify (3)**
6:14;15:17;16:6
**November (1)**
11:8
**Number (11)**
24:15;33:12,13,15,17;
48:22,23;49:3,6,9,16
**numbers (1)**
40:23

## O

**object (6)**
10:2;15:19;37:8;38:3;
39:13;48:3
**objected (1)**
22:4
**objection (4)**
4:25;16:11,18;42:20
**obligation (1)**
16:7
**obviously (1)**
8:23;25:23
**occur (1)**
45:25
**occurred (2)**
23:4;34:6
**occurs (3)**
35:21;40:6;41:9
**October (1)**
33:20
**off (1)**
13:25
**office (37)**
4:21;22:7;8,15;9:6,13,
14;11:6,12;12:5;18:16;
19:5,19;20:24,24;24:13;
26:8,22;29:12;30:13;
31:5,7,13,16;32:6,13,18,
22;33:8,19;34:3,21;
38:1;40:4;44:4;46:10;
48:18
**officers (1)**
10:10
**offices (5)**
10:25;11:3,11,23;
32:16
**often (1)**
19:8
**once (1)**
22:15
**one (33)**

6:8;9:14;10:25;11:7,
22;14:22;18:18;19:6,7,
24;20:1,5,8,9,11,14,16,
19;21:3,4;22:2,17,17;
24:6;25:20;31:16,20,24;
33:11;41:10,11;42:4;
50:24
**ones (1)**
44:5
**one-time (1)**
27:18
**only (8)**
27:18;32:3;40:12,20;
41:10;47:25;49:2,7
**operations (1)**
13:3
**opportunities (1)**
18:3
**order (3)**
15:17;21:17,18
**original (2)**
27:13;34:1
**originally (1)**
17:15,20;20:5
**otherwise (1)**
8:2
**ours (1)**
6:9
**out (11)**
10:8;11:23;18:13,14;
29:14,15;31:25;36:3;
37:4;47:17;50:18
**outs (2)**
12:24;42:13
**outside (7)**
18:15,20,21;33:3;
42:21,23,23
**over (3)**
6:11;12:23;17:23
**oversee (2)**
19:7;47:22

## P

**PACER (6)**
23:20,21;27:14;28:7;
41:6,11
**page (16)**
7:7;8:12;11:5;15:12;
21:2,4;23:25;24:4,10,21,
22;25:4;28:16,20;29:6;
50:8
**pages (1)**
52:6
**Paralegals (2)**
13:11;44:6
**part (1)**
26:9
**particular (3)**
23:10;36:4;43:12
**parties (3)**
48:5,6;49:13
**Partner (5)**

35:15;40:1,2,18,21
**party (3)**
18:5;35:2;47:25
**Pasadena (32)**
6:16,19,20,22;8:11,21;
9:8,15,21,24;10:1,8,13;
11:6,14;12:6;14:19;
19:25;20:7,14,15,18;
21:20,22;22:2,21;24:12;
25:2,6,15;27:6;34:3
**passed (1)**
13:22
**people (5)**
13:11,23;14:10;44:7;
48:9
**percent (1)**
45:8
**percentage (1)**
10:13
**performed (1)**
40:18
**permits (1)**
49:12
**permitted (3)**
48:16;49:13,14
**Peroutka (52)**
5:6,6,6;6:10,10,15,15,
17,17,21,21,22,23;7:8,9,
12,12,17,18,18;8:19,19,
22,22;9:15,15;10:9,9,14,
14;11:6,6,13,13;12:5,8,
8,18,18;14:18,19;18:18,
22,22;20:9,9;22:3,16,16;
25:20;27:2;28:14;30:6
**Peroutka's (4)**
12:6;25:20;27:2;28:14
**person (4)**
29:1,9;42:2;44:22
**personal (1)**
41:5
**personally (5)**
14:6;29:13;36:8,12;
45:20
**personnel-related (1)**
13:5
**person's (1)**
44:25
**pertain (1)**
42:20
**Phone (9)**
33:9,12,13;38:25;
49:2,5,7,9,16
**phonetic (2)**
34:22;42:22
**picks (1)**
38:25
**place (4)**
36:12;43:4,12;50:13
**placed (10)**
20:11;22:23,25;24:17;
27:2,7,15;43:8;46:10;
47:5
**placement (10)**

23:12;27:20;33:18;
34:1;40:22;41:14,19,25;
43:18;49:6
**plaintiff (8)**
4:4,7;15:16;29:1,9,22;
30:5,10
**plaintiff's (2)**
29:2,10
**please (15)**
5:5;6:11,13;7:2;21:2;
23:25;24:10;25:4;28:16,
20,22;29:6;43:7;44:25;
45:3
**plus (1)**
14:7
**pm (1)**
52:2
**point (6)**
9:14;10:2;11:1,7;
39:15;45:17
**policies (5)**
22:4;48:2;50:11,13,14
**policy (6)**
32:1;48:18;50:12,17,
21;51:4
**posed (1)**
37:14
**position (1)**
5:7
**possible (1)**
6:14
**practices (2)**
12:23;13:18
**prepared (1)**
37:12
**pretty (1)**
17:17
**prevent (3)**
17:11,14;43:5
**prevents (1)**
17:7
**previous (2)**
8:13;38:8
**PRI (5)**
26:12,15,22;27:6;30:6
**principal (6)**
4:22;7:8,14,18;9:3;
11:5
**principals (1)**
14:7,8
**printed (1)**
7:10
**printing (1)**
23:3
**prior (8)**
5:19;11:8;16:10;
21:22;23:6;30:13;47:3,4
**PRI's (3)**
25:18,18,21
**privileged (1)**
8:24
**probably (1)**
48:4

**problem (3)**
21:16;22:6;39:2
**problems (1)**
47:11
**procedure (5)**
36:25;41:6,21;45:21;
50:23
**procedures (3)**
22:4;37:5;43:4
**proceeding (1)**
43:18
**proceedings (1)**
36:6
**process (9)**
17:21,23;22:15;23:14;
37:1;43:16,17;45:22;
50:20
**processes (1)**
43:12
**professional (1)**
51:17
**professionally (1)**
51:14
**program (1)**
18:11
**proper (1)**
45:25
**properly (1)**
4:24
**proprietary (1)**
37:10
**provide (5)**
18:1;24:8;33:13;34:5;
44:25
**provided (13)**
14:3;15:5;24:8,20,24;
33:16,17,23,25;36:16;
41:2;49:6;50:13
**provides (1)**
18:4
**providing (2)**
37:9;47:9
**pulled (5)**
27:6;31:15,17;33:24;
34:2
**purchased (2)**
20:19,21
**purpose (2)**
48:13,14
**purposes (4)**
37:11;39:15;48:12,15
**put (7)**
15:4;22:11;24:12;
28:1;35:22;37:11;40:18

**R**

**raise (2)**
4:25;35:7
**reacted (1)**
44:11
**read (6)**
6:3;28:22;29:5,7;52:1,

6
**reasons (1)**
37:8
**recall (7)**
19:24;21:10;29:13,14,
15;33:7;46:11
**Receivables (21)**
6:16,19,22;8:11,21;
9:21,24;10:1,13;11:6,14;
12:6;14:19;19:25;20:7,
14,15,18;21:21,23;22:2
**Receivables' (2)**
25:2,15
**receive (3)**
6:13;43:19;45:17
**received (3)**
21:20;22:14,15
**recent (1)**
21:18
**recently (1)**
9:4
**recognize (1)**
14:20
**recollection (2)**
26:9;45:12
**record (6)**
4:23;15:1;33:21;35:1,
23,25
**recorded (1)**
52:8
**refer (1)**
50:4
**referred (2)**
20:7
**referring (3)**
15:21;25:19,21
**refresher (1)**
19:8
**regard (1)**
19:23
**regarding (4)**
14:19;23:16;28:15;
31:25
**regards (1)**
39:22
**related (2)**
10:14;42:24
**relates (2)**
10:5;40:12
**relationship (1)**
6:20
**relationships (1)**
10:15
**relevance (1)**
31:21
**relevant (8)**
37:6;38:4,7,21,22;
39:10,12;42:24
**remedying (1)**
45:21
**remember (2)**
17:21;51:5
**repeat (2)**

10:16;39:16
**Rephrase (2)**
16:14;45:19
**report (3)**
43:22,23;46:8
**reported (2)**
43:22;45:13
**reporter (1)**
6:14
**representation (2)**
32:11,14
**request (1)**
21:11
**require (1)**
21:11
**required (1)**
47:10
**residence (1)**
31:25
**resident (6)**
7:8,17,20;8:13,17;9:4
**respect (5)**
16:2;22:7;32:14;37:9,
13
**respective (1)**
22:14
**response (4)**
21:11;34:4;36:14;50:4
**responses (1)**
24:7
**responsibility (2)**
17:13;32:7
**responsible (1)**
44:16
**restricted (1)**
47:25
**retrain (1)**
50:22
**review (4)**
5:25;18:11,15;50:20
**reviewed (7)**
5:21,23,24;18:2,17,20;
21:7
**right (27)**
5:15,15;6:7;11:9;12:7;
13:13;14:17,25;15:12,
24;17:15,17;27:17;
28:22;33:7;35:5;37:3,
25;38:24;39:2;41:3;
45:7,9;49:20;50:10,20;
51:11
**Ritchie (3)**
7:15;11:7;19:4
**Rowe (1)**
10:16
**R-U-C-K-E-L- (1)**
42:4
**Ruckelshaus (1)**
42:3
**rules (1)**
4:19
**running (1)**
13:4

**runs (1)**
24:21

**S**

**same (22)**
6:16;9:3,4,5,6,13,14;
10:18;11:9,10,12,13,14,
23;17:17;25:7;35:16,18;
36:18;42:9;46:14;47:1
**scheduled (1)**
23:3
**scheduling (1)**
21:17
**scope (2)**
32:11;38:5
**scrub (8)**
16:7,9;23:23;27:14,
19;40:6;43:17;47:18
**scrubbed (5)**
23:1,11,16;42:15;47:6
**scrubs (2)**
23:6;40:17;41:7
**SDAT (1)**
7:7
**search (2)**
41:11;42:11
**second (2)**
8:12,14
**Security (1)**
40:23
**seems (1)**
32:12
**semantics (1)**
30:12
**seminars (4)**
13:24;17:18;19:11,18
**send (2)**
18:13;27:22
**sense (1)**
11:22
**sent (15)**
6:9;18:14;19:25;
20:24;25:8,13;26:7,8,21,
22;29:14;30:19;40:22;
47:6,17
**sentence (3)**
28:23;29:5;30:9
**separate (10)**
6:15;9:2,8,9,18,20,22;
19:5;40:7,19
**September (5)**
29:17;30:22;46:14,23;
47:16
**set (2)**
25:10,11
**Shadi (6)**
20:3;25:11,12,14,15,
16
**Shady (1)**
25:17
**share (4)**
10:10;11:2,11,22

**shared (1)**
10:25
**S-H-A-U-S (1)**
42:5
**SHAWN (2)**
4:3;52:14
**sheet (1)**
52:9
**show (2)**
21:21;46:18
**showed (2)**
11:5;30:22
**showing (1)**
7:7
**sign (1)**
52:1
**signature (3)**
24:2;28:18,19
**signed (1)**
26:2
**simple (1)**
7:23
**small (1)**
43:3
**Social (1)**
40:23
**software (7)**
35:12,14,16,17,18,19;
40:19
**sole (1)**
32:7
**solely (1)**
39:14
**somebody (1)**
38:24
**someone (3)**
17:2;18:5;45:23
**somewhere (1)**
21:10
**soon (2)**
6:14;12:17
**sorry (11)**
8:16;12:9;19:16;20:3;
25:18;26:14;31:3;32:24;
40:15;50:15;51:21
**sort (5)**
9:5,6,7,7;17:22;19:8,
12,18;21:5;24:11,21;
25:7;27:6;37:6;41:18
**sp (2)**
34:22;42:22
**speaking (1)**
36:24
**special (1)**
9:7
**specific (6)**
17:18;19:15;36:15,20,
21;49:3
**Specifically (1)**
40:9
**spell (3)**
42:4;45:3,8
**spoke (1)**

33:6
**spoken (1)**
  33:4
**staff (2)**
  19:20,21
**start (2)**
  22:18;42:9
**starts (1)**
  24:21
**state (2)**
  5:5;20:2
**stated (1)**
  37:8
**statement (1)**
  17:14
**statements (3)**
  17:8,9,12
**stating (1)**
  29:2
**status (1)**
  26:16
**statute (7)**
  14:14;15:15,18;16:14;
  50:12,14,25
**statutory (1)**
  38:8
**stay (7)**
  36:7;38:1,17;39:23;
  43:13,20;46:1
**stays (1)**
  44:12
**Stephen (1)**
  7:17
**steps (1)**
  43:19
**Steve (1)**
  7:19
**still (2)**
  39:13;47:13
**stop (1)**
  5:1
**strike (4)**
  50:24;51:2,3,7
**strikes (2)**
  50:18,19
**Studies (2)**
  12:13,14
**study (1)**
  12:12
**subject (2)**
  4:10;10:17
**sublet (1)**
  12:6
**submitted (1)**
  22:6
**subsequent (2)**
  27:17;47:3
**subtenant (1)**
  11:19
**sued (2)**
  38:1,16
**suit (1)**
  47:3

**Suite (1)**
  11:7
**Sung (31)**
  6:8;10:16;19:23;20:4,
  4,11;22:9;23:8;28:5,10;
  29:13;30:14,15;31:7;
  32:18,23;33:6;34:22;
  35:8,10,16;37:13,15;
  40:11;42:20;48:17,19,
  20;49:5,17;50:5
**Sung's (6)**
  22:13;28:15;31:6,23;
  36:4;46:9
**supervise (2)**
  43:21;45:9
**supervised (1)**
  44:8
**supervising (1)**
  36:9
**supervisor (3)**
  36:9;42:1;44:14
**sure (13)**
  10:5;11:2;12:23;
  15:24;16:21;22:18;23:2;
  33:14;36:22;43:18;
  44:18;45:8,25
**sworn (1)**
  4:5
**system (10)**
  35:6,11,12,14;37:10;
  40:2,7,7,21;41:20

**T**

**talk (1)**
  31:9
**talking (2)**
  48:17,19
**technical (1)**
  42:12
**tecum (1)**
  21:5
**telephone (3)**
  31:6,12;32:17
**terms (11)**
  15:4,5;22:3;26:6;35:7;
  36:16,24;38:7,9;39:23;
  40:17
**testified (1)**
  4:6
**testifying (1)**
  15:25
**testimony (2)**
  31:24;34:18
**Thanks (1)**
  7:16
**therein (1)**
  52:8
**third (8)**
  8:14,15;18:5;35:2;
  47:25;48:5,6;49:13
**though (1)**
  40:15

**three (6)**
  18:23,24;33:11;44:4;
  50:18,19
**throughout (1)**
  14:2
**times (3)**
  42:18;43:8;48:25
**today (4)**
  5:19,22;6:7;7:11
**together (2)**
  15:4;37:11
**told (1)**
  45:14
**toward (1)**
  43:1
**track (1)**
  35:6
**train (1)**
  47:21
**trained (6)**
  14:11,13;15:22;17:16,
  21;49:11
**training (18)**
  13:13,16,17,20;14:5;
  15:23;17:25;18:2,3,4;
  19:7,17,21,22;36:15,19;
  47:22;49:11
**transaction (1)**
  26:16
**transcript (1)**
  6:13
**transcription (1)**
  52:7
**transferred (2)**
  26:18,19
**treated (1)**
  37:18
**treatment (1)**
  51:16
**trick (1)**
  6:6
**truthfully (1)**
  6:11
**trying (5)**
  6:6;9:1;10:8;31:25;
  37:4
**turn (8)**
  15:12;21:2;23:25;
  24:4;25:4;28:16,20;50:8
**turning (1)**
  24:10
**Twenty-three (2)**
  5:11,12
**two (14)**
  6:7;9:17,22;10:15;
  20:3;28:8;31:2;33:11;
  40:12,24;41:1,3;42:25;
  49:5
**typically (1)**
  41:2

**U**

**Um (1)**
  7:22
**unaware (1)**
  29:8
**uncomfortable (1)**
  4:10
**under (10)**
  15:15;16:14,15,25;
  47:10;49:14;51:3,6,6,9
**Underneath (1)**
  44:14
**unless (2)**
  8:1;25:13
**up (3)**
  9:3;37:17;38:25
**update (1)**
  14:4
**use (3)**
  35:6,11,16
**uses (1)**
  23:19
**using (1)**
  40:1

**V**

**vague (1)**
  45:18
**validation (1)**
  47:9
**various (7)**
  13:4;14:2,3;17:25;
  18:2;19:21;23:1
**verification (1)**
  42:16
**verify (1)**
  26:4
**violate (3)**
  43:13;44:12;50:12
**violates (1)**
  21:17
**violating (3)**
  38:24;46:1;50:14
**violation (6)**
  10:18;38:1,11;39:23;
  50:24;51:13
**violations (2)**
  39:4,17

**W**

**Wallace (1)**
  14:22
**warranted (1)**
  39:17
**way (5)**
  10:5;22:11;31:10;
  32:3;33:22
**weird (1)**
  42:8
**weren't (2)**
  18:14;37:18
**what's (2)**

23:23;32:20
**WHEREUPON (2)**
  4:2;52:2
**whole (1)**
  29:5
**who's (1)**
  5:15
**widespread (1)**
  43:4
**withdrawn (3)**
  27:8;31:18;34:3
**within (9)**
  11:13;13:23;14:10;
  18:5;19:17,18;44:11;
  48:2;51:15
**without (2)**
  20:22;41:2
**WITNESS (21)**
  6:1,4;7:25;8:3,5;9:22;
  10:23;11:15;12:1;16:21,
  24;17:2;23:11;28:9;
  42:23;43:11;48:5;51:9,
  12,21,23
**work (6)**
  6:14;11:13;13:11;
  18:21;19:4,5
**worked (2)**
  5:9;12:20
**workload (1)**
  9:25
**works (3)**
  17:21;23:15;42:13;
  43:17
**written (1)**
  44:10
**wrong (2)**
  25:10,13

**Y**

**year (4)**
  11:8;14:2;18:3;46:14
**yearly (2)**
  19:10,11
**years (4)**
  5:11,12;12:23;17:23
**Yep (1)**
  50:15